# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**SHERLYN BROWN,**

    Plaintiff,

  -vs-                        Case No. 13-C-747

**MILWAUKEE BOARD OF SCHOOL DIRECTORS,**
**a/k/a MILWAUKEE PUBLIC SCHOOLS,**

    Defendant.

## DECISION AND ORDER

Sherlyn Brown alleges that Milwaukee Public Schools, her former employer, failed to reasonably accommodate her knee disability in violation of Title I of the Americans with Disabilities Act. Both parties move for summary judgment. MPS's motion is granted, Brown's motion is denied, and this matter is dismissed in its entirety.

## BACKGROUND

Brown was hired by MPS as a Teacher's Aide in 1993. Subsequently, Brown held a variety of positions before being promoted to Assistant Principal on August 20, 2004. Brown was assigned to eight different schools over her career as an Assistant Principal. Most recently, Brown was the Assistant Principal at Starms Discovery Learning Center for the 2010-11 school year.

Brown's job duties as Assistant Principal included, but were not

limited to: coordinating, supervising, and providing leadership in the school's program of student control and discipline; supervising and controlling student accounting; meeting with parents whose children are having academic and/or behavioral difficulties; planning class schedules and organizing classes; coordinating supervision for playground activities and student entry to and exit from the building; assisting the Principal with Teacher orientation and in-service training; assisting the Principal in the delegation of duties to staff members; assisting the Principal in coordinating the activities of the school psychologists, social workers, building engineer, nurse, and doctor; making arrangements for the conduct of summer school, if scheduled; assisting the Principal with fiscal responsibilities; keeping abreast of developments and changes in the field; and related duties.

As an Assistant Principal, Brown belonged to The Administrators and Supervisors Council ("ASC"), a union that had a collective bargaining agreement with MPS. Under the CBA, MPS had the "sole right" to assign and reassign members of the bargaining unit. This right was also recognized by the MPS Employee Handbook.

During the 2006-2007 school year, Ms. Brown began experiencing pain in her left knee while assigned as an Assistant Principal at Cass Street School. On or about October 11, 2006, William Smith, M.D., Brown's treating physician, diagnosed Brown as having "severe arthritis in the lateral and

patelloformal compartments" of her left knee.

Subsequent to her severe arthritis diagnosis, Brown underwent four surgical procedures on her left knee: a total left knee replacement on May 11, 2009, removal of a loose patellar component on November 9, 2009, arthroscopic debridement of the knee joint and open removal of a loose patellar component on March 25, 2010, and Zimmer augmentation of the patella with a revision of the patellar component on September 23, 2010.

Brown was diagnosed with a "permanent disability" by multiple physicians. Brown's knee disability limits her ability to walk, stand, and climb stairs; she uses a cane to walk. Brown experiences weakness and a feeling of instability in her left knee, pain in her left knee, muscle weakness in her left thigh, and a low tolerance for walking long distances. Dr. Smith imposed permanent, physical work restrictions on Brown, limiting her ability to walk, stand, and climb stairs, as well as her ability to be placed into positions that require physical restraint of students. Brown's need for surgery on November 9, 2009 — removal of a loose patellar component — was caused by her physical restraint of a student.

Based on the permanent, physical work restrictions and limitations resulting from Brown's knee disability, MPS periodically transferred Brown into different positions or between different locations, and it modified her job duties and responsibilities as an Assistant Principal. MPS's "Accommodations

- 3 -

Administrator," James R. Gorton, was directly responsible for handling Brown's accommodations and job modification issues.

On May 7, 2010, Gorton received a letter from Dr. Smith which stated that incidental contact "should not be a problem. One-on-one contact or if student restraint is not required, it certainly should be fine." Dr. Smith noted that Brown had been injured while "restraining a third grader at school," the "kind of 'student interaction' that [he] would prefer that she avoid."

On July 28, 2010, Dr. Smith faxed a letter to Gorton in which he concluded, based on his most recent exam, that Brown would need additional surgery. Dr. Smith recommended that Brown would be much better off at a central location that did not require movement as an Assistant Principal. Dr. Smith also opined that Brown should not be "in the vicinity of potentially unruly students." Dr. Smith stated that these restrictions were permanent and that they were unlikely to change for three to four years into the future, even with additional surgery. Based on this restriction, Gorton determined that Brown was "not capable of performing [her] core duties as Assistant Principal, with or without reasonable accommodation." Accordingly, MPS placed Brown on a leave of absence.

On September 23, 2010, Gorton received a letter from Brown's lawyer, Mark Sweet, stating that Brown's restrictions "would simply limit her ability to serve in a position of authority (i.e., assistant principal) over potentially

- 4 -

unruly students. Your assumption that Brown is unable to work in an environment where she interacts with students and staff is, at best, in error." On March 16, 2011, Gorton received Dr. Smith's response to a Medical Questionnaire, in which Dr. Smith stated: "My understanding is that the current situation was precipitated by the patient's attempt to control and discipline an unruly student … she should not be put in a position where the left knee can be further compromised in attempting to subdue an unruly student."

After Brown was removed from the Assistant Principal position, Gorton instructed Brown to review available MPS positions and apply for positions in which she was interested. MPS did not excuse Brown from the competitive process for any vacant positions.

On August 4, 2010, in an email to Brown, Gorton discussed eight positions that he investigated, but went on to say that she was not qualified for any of the positions, noting with respect to five of the eight that "the job duties require being in the vicinity of potentially unruly students." Gorton further stated: "I do not anticipate 'just placing you' in a position. I anticipate engaging in a dialogue with you in the event I identify a suitable position."

On April 7, 2011, Brown applied for the position of MPS/GE Grant Administrator. Kimberly LaMothe, MPS's Human Resources Coordinator, screened the applicants and determined that Ms. Brown was qualified for the

position. On April 19, 2011, LaMothe emailed Brown, stating in part, "The initial screening for … MPS/GE Grant Administrator … has been completed. It is with pleasure that I inform you that you met all qualifications and your application and credentials will be forwarded to the interview committee for consideration and an interview." As a result of the competitive hiring process, Brown was not invited to interview and was not hired because she was not the "most objectively or subjectively qualified" candidate for the position.

On May 23, 2011, Brown applied for the position of Title I Coordinator. On June 1, 2011, Yovira Moroney, Human Resources Coordinator, emailed Brown, stating in part, "The initial screening for … Title I Coordinator … has been completed. It is with pleasure that I inform you that you met all qualifications and your application and credentials will be forwarded to the interview committee for consideration for an interview." As a result of the competitive hiring process, Brown was not invited to interview and was not hired because she was not "the most objectively or subjectively qualified" candidate for the position.

On July 17, 2014, MPS sent Brown a letter stating that her three-year entitlement to a formal leave of absence was about to end on September 2, 2014. "Prior to this date you must either return to work or resign from your position. … If you wish to return to work, you must submit the enclosed Fitness-For-Duty Certificate to Mr. Gorton prior to obtaining an assignment

for the 2014-2015 school year." On August 7, 2014, Gorton received an email from Ms. Brown stating, in part, "I am writing to inform you I wish to return to work at Milwaukee Public Schools. I request a position, date, time and location to which to report."

On August 29, 2014, MPS received a Fitness-For-Duty Certificate from Dr. Smith. Dr. Smith enclosed notes from his August 26, 2014 examination of Ms. Brown:

> 1.  The patient, as before, should not be put in a position where she is responsible for monitoring and controlling students that may become uncontrollable.
>
> 2.  She should not be required to walk or stand for more than one-half hour per hour. …
>
> …
>
> 4.  These restrictions are permanent, but I do not see why they would prevent her from working as a school administrator. When I reviewed the 15 requirements of the [Assistant Principal] job listed in the 08/07/2014 fax from Mr. Gorton, #1 thru #14 appear to be things that she could easily do, and #15, which states 'performs other duties as assigned,' is the only one that would give me concern. I see no reason why she could not be around students; she just must not be responsible for controlling those students, and it would seem that Security should be available to handle such things.

On August 29, 2014, Gorton emailed Brown as follows: "Although Ms. Brown's leave rights would ordinarily end on 9/2/14 … I am making a temporary exception in order to consider the new medical documentation …

- 7 -

Ms. Brown's leave will be extended temporarily pending the review." MPS terminated Brown's employment via letter dated November 19, 2014: "A job search has been conducted. The search revealed no lateral vacant position[s] for which you are qualified. MPS cannot offer you an indefinite leave. Therefore, your employment with Milwaukee Public Schools is terminated for non-disciplinary reasons, effective today."

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one identified by the substantive law as affecting the outcome of the suit. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A "genuine issue" exists with respect to any such material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 681-82. Thus, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The ADA makes it unlawful to "discriminate against a qualified

individual with a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Included in the ADA's definition of discrimination is "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

To establish a prima facie case for failure to accommodate, Brown must show that (1) she is a qualified individual with a disability; (2) MPS was aware of her disability; and (3) MPS failed to reasonably accommodate her disability. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013). To survive summary judgment, Brown must present the Court with evidence that, if believed by a trier of fact, would establish all three elements of her claim. *Id.*

An individual is "qualified" under the ADA only if he or she is able, "with or without reasonable accommodation, [to] perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). MPS argues that Brown is not qualified to be Assistant Principal because of her inability to work around unruly children/students.

Brown counters that she was not precluded from working around or in the vicinity of children, unruly or otherwise. Instead, Brown was medically restricted in her ability to physically restrain and control students. This is just splitting hairs. The only way to avoid being put in a position that required Brown to physically restrain students was to keep her away from students in the first instance. Put another way, Brown argues that working in the vicinity of potentially unruly students is not an essential function of the Assistant Principal position, but being in their vicinity is just one step removed from potential becoming reality.

The need to physically restrain students is an essential function of the Assistant Principal position. In Brown's own words:

> … it has always been that I would be responsible for student control. Monitoring their behavior, whether it's outside for recess, which would be playground duty, arrival of buses, passing in the hallways between classes, during the lunch breaks. … But it's always been – the role of an assistant principal is always one of monitoring students, every job I've ever had. So there's breaches of discipline, fights. I've never had to break up a fight as an assistant principal, but I've had to control students physically because of their actions. They might be swinging, ready to pounce on somebody. Even adults. I've had a student bite me because of – he didn't like what I was saying. So it's about student control.
>
> … I'd have to physically be involved with them whether it's on the playground, you know, in the halls, in the cafeteria, dismissal, arrival, that would be my responsibility to be there to monitor their behavior. And if anything were to transpire, I'd have to intervene.

MPS's Proposed Findings of Fact, ¶ 130 (citing Brown's deposition testimony). Brown argues that student control could be handled by security officers. Not every MPS school has a security guard, MPS PFOF, ¶ 132, and it is unreasonable to require MPS to assign a security guard to, essentially, shadow Brown in the event that a student needs restraining. "To have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 534 (7th Cir. 2013). Therefore, Brown cannot establish a failure to accommodate claim in relation to her former job as Assistant Principal.

Brown also argues that she should have been reassigned to a vacant position at MPS. Reassignment to a vacant position is a potential reasonable accommodation for disabled employees. 42 U.S.C. § 12111(9). In 2000, the Seventh Circuit held that employers are not required to reassign employees who are losing their current positions due to disability to a vacant position for which they are qualified. *EEOC v. Humiston-Keeling*, 227 F.3d 1024 (7th Cir. 2000). Twelve years later, in *EEOC v. United Airlines, Inc.*, 693 F.3d 760 (7th Cir. 2012), the Seventh Circuit finally overruled *Humiston-Keeling*, making clear that *Humiston-Keeling* did not survive *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

- 11 -

Case 2:13-cv-00747-RTR   Filed 03/30/16   Page 11 of 15   Document 83

The Seventh Circuit now holds, pursuant to *Barnett*, that the ADA "does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer." *United Airlines*, 693 F.3d at 761; *see also Barnett*, 535 U.S. at 401-02 ("a plaintiff/employee … need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases. … Once the plaintiff has made this showing, the defendant/employer then must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances"). Put another way, "accommodation through appointment to a vacant position is reasonable. Absent a showing of undue hardship, an employer must implement such a reassignment policy." *United Airlines* at 764.

MPS determined that Brown met the minimum qualifications for the Title I Coordinator position and the GE Grant Administrator position. Brown didn't get either job because MPS did not except her from the competitive process. According to Brown, she was entitled to one of these positions as a reasonable accommodation, even if other individuals were more qualified.

Not so because an employer "does not have to accommodate a disabled employee by promoting him or her to a higher level position." *Malabarba v. Chi. Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998). "The ADA is designed to

prevent discrimination against a qualified individual with a disability. It is not a statute giving rise to a right of advancement. Thus, the only positions that need to be considered for a reassignment are those that are not promotions." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1176 (10th Cir. 1999); *see also Koessel v. Sublette Cnty. Sheriff's Dep't*, 717 F.3d 736, 745 (10th Cir. 2013) ("employers need not promote an employee when they reassign him, …"). Neither *United Airlines* nor *Barnett* stand for anything to the contrary.

To determine whether a new position is "objectively better, … a number of factors may be relevant, including whether the position: entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skill, education, or experience; is obtained through a complex competitive selection process; or is otherwise objectively more prestigious." *Alvarado v. Texas Rangers*, 492 F.3d 605, 614 (5th Cir. 2007); *see also McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625-26 (7th Cir. 2004). The Court recognizes that these cases arose in a different context – determining whether a transfer (*McKenzie*) or the denial of a transfer (*Alvarado*) constitutes an adverse employment action under Title VII. The same concepts should apply in the instant case. An employee is not entitled to an objectively better job as a reasonable accommodation under the ADA.

The job description for GE Grant Administrator states that it was a

- 13 -

transfer opportunity for current MPS employees and that the transferee's salary would remain the same. ECF No. 64, Affidavit of James Gorton,[1] Exhibit 40. Actually, Brown's salary would have increased from $84,753 to $99,128 by virtue of working year-round in the GE position as opposed to 10 months as Assistant Principal. ECF No. 80, Affidavit of James Gorton, ¶ 7; ECF No. 81, Affidavit of Pepper LaMothe, ¶ 16. For Brown, this job also would have resulted in a significant increase in job duties, responsibility, prestige, and advancement opportunities. Brown's duties as an Assistant Principal were confined to a particular school, but the GE Grant Administrator was responsible for the successful administration of a $20 million grant for the benefit of the entire school district. The job was better in all material respects.

Similar to the GE Grant position, the Title I Coordinator position involved greater responsibility than the Assistant Principal position. The Title I Coordinator assumed oversight and facilitation responsibilities for projects funded by Title I, such as compliance, collaboration, and writing grant proposals. Brown also would have received a pay increase to $107,058. Gorton Aff., ¶ 10; LaMothe Aff., ¶ 18. Once again, the Title I Coordinator was a promotional opportunity, not a lateral transfer.

---

[1] Brown moves to strike Gorton's affidavit on the grounds that it is not based on personal knowledge. The Court does not agree. Gorton's affidavit is based on personal knowledge obtained while engaging in the interactive process of accommodating Brown's disability.

- 14 -

Finally, Brown identifies three other positions to which she should have been transferred: Student Achievement Supervisor, Charter School Program Officer, and Student Services Coordinator – Student Issues. Brown was not qualified for any of these positions for the same reason she was not qualified to be an Assistant Principal. All three positions required her to be in the presence of potentially unruly children. *Rehling v. City of Chi.*, 207 F.3d 1009, 1014 (7th Cir. 2000) ("The employer need only transfer the employee to a position for which the employee is otherwise qualified").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. Brown's motion to strike [ECF No. 75] is **DENIED**;

2. Brown's motion for summary judgment [ECF No. 53] is **DENIED**; and

3. MPS's motion for summary judgment [ECF No. 61] is **GRANTED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of March, 2016.

                                                          **BY THE COURT:**

                                                          */s/ Rudolph T. Randa*

                                                          **HON. RUDOLPH T. RANDA**
                                                          **U.S. District Judge**